**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| ELLEN HARRISON, JASMINE CARBER, KRISTINE SEXTON, individually and on behalf of all others similarly situated, ) ) ) | **CIVIL ACTION NO.**: |
| Plaintiffs, ) ) | |
| v. ) | |
| IOWA HEALTH SYSTEM d/b/a UNITYPOINT HEALTH, THE IOWA HEALTH SYSTEM BENEFITS COMMITTEE, and JOHN DOES 1-10, ) ) ) ) ) | |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, Ellen Harrison, Jasmine Carber and Kristine Sexton ("Plaintiffs"), by and through their attorneys, on behalf of the Iowa Health System Section 401(k) Retirement Savings Plan (the "Plan"), themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, Iowa Health System d/b/a UnityPoint Health ("Iowa Health" or the "Company") and the Iowa Health System Benefits Committee (the "Committee") (collectively, the Company and the Committee are referred to as the "Defendants") for breaches of their fiduciary duties.

2.    The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditors' Report ("Auditors' Report"), attached to the 2024 Form 5500 for the Plan, at 7 ("The Plan is a defined

contribution plan covering all eligible employees of a participating Employer as defined by the Plan documents.").

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009); *see also* Iowa Health System Section 401(k) Retirement Savings Plan, effective as of January 1, 2014 ("Plan Doc."), at 74 ("Each fiduciary shall discharge its duties with respect to the Plan solely in the interests of Participants and their beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."); Iowa Health System Section 401(k) Retirement Savings Plan Summary Plan Description ("SPD"), at 30 ("The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.").

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[1]; *see also Tibble v. Edison Int'l*,

---

[1] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.      At all times during the Class Period, the Plan had over two billion dollars in assets under management. At the start of the Class Period in 2020, the Plan had $2,866,617,144 in assets under management. *See* 2020 Form 5500 for the Plan, Schedule H at 2.

10.     By 2024, the Plan had $3,306,056,205 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H at 2.

11.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2022, only 0.1 percent (852 of 684,970) of plans in the country had more than $1 billion in assets under management.[2] In addition, this was true at the start of the Class Period in 2020 where only 0.1 percent (892 of 616,050) of 401(k) plans in the country were as large as the Plan.[3]

12.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 37,944 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 34,138 participants. *See* 2043 Form 5500 for the Plan, at 2.

13.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14.     Specifically, Defendants allowed substantial assets in the Plan to be invested in a guaranteed investment contract with Lincoln National Life Insurance Company (the "Lincoln National GIC"), that provided significantly lower rates of return than comparable investments that Defendants could have made available to Plan participants.

---

[2] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2022 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2020 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf.

15.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16.    Lincoln National benefited significantly from participants in the Plan investing in the Lincoln National GIC. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Lincoln National GIC was benefiting Lincoln at the expense of the participants in the Plan. The investments in the Lincoln National GIC were held and invested by Lincoln National, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Lincoln National provided to the Plan were and are so low that Lincoln National reaped a windfall on the spread.

17.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

18.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I) and failure to monitor fiduciaries (Count II).

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20.    This Court has personal jurisdiction over Defendants because the Plan is administered in this District meaning the Company transacts business in this District, resides in

this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

21. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because the Company does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

22. Plaintiff, Ellen Harrison ("Harrison"), resides in Checotah, Oklahoma. During her employment, Plaintiff Harrison participated in the Plan. Ms. Harrison invested in the Lincoln National GIC in the Plan and suffered injury to her Plan account due to the significant underperformance of the Lincoln National GIC.

23. Plaintiff, Jasmine Carber ("Carber"), resides in Moore, South Carolina. During her employment, Plaintiff Carber participated in the Plan. Ms. Carber invested in the Lincoln National GIC in the Plan and suffered injury to her Plan account due to the significant underperformance of the Lincoln National GIC.

24. Plaintiff, Kristine Sexton ("Sexton"), resides in Ankeny, Iowa. During her employment, Plaintiff Sexton participated in the Plan. Ms. Sexton invested in the Lincoln National GIC in the Plan and suffered injury to her Plan account due to the significant underperformance of the Lincoln National GIC.

25. Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently,

or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

26.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

***Company Defendant***

27.     Iowa Health System d/b/a UnityPoint Health is the sponsor of the Plan with a principal place of business at 1776 West Lakes Parkway, West Des Moines, Iowa. *See* 2024 Form 5500 for the Plan, at 1; *see also* Plan Doc., at 1 ("The 'Sponsor' is the Iowa Health System, an Iowa nonprofit corporation."); SPD, at 2 ("The Sponsor of the Plan is the Iowa Health System, d/b/a UnityPoint Health.").

28.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Iowa Health, directly or by acting through its Board of Directors, appointed members of the Committee. *See* Plan Doc., at 70 ("Individual members of the Benefits Committee may be replaced or removed by written notice of the Sponsor. The Sponsor may establish specific terms of office for any member appointed by the Sponsor."). Under ERISA, fiduciaries with the power to appoint have a concomitant fiduciary duty to monitor and supervise their appointees.

29.     Further, at all times, Iowa Health acted through its officers to perform Plan-related fiduciary functions. These officers were acting in the course and scope of their employment.

30.     Accordingly, Iowa Health during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

*Committee Defendants*

31.      The Benefits Committee is a named fiduciary and Plan administrator for the Plan. *See* Plan Doc., at 8 ("The 'Plan Administrator'' is the Benefits Committee as described and organized under Sec. 11.1 hereof."); *see also id*. ("The Plan Administrator is a 'Named Fiduciary' for purposes of ERISA with authority to control or manage the operation and administration of the Plan, including control or management of the assets of the Plan.").

32.      The Committee's powers and duties included, among other things, "to select the class or classes of investment options that will be available under the Plan for the directed investment of the Accounts of the Participants." Plan Doc., at 72.

33.      Each member of the Committee during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each had control over Plan management and/or authority or control over management or disposition of Plan assets.

34.      Members of the Committee during the Class Period are collectively referred to herein (referred to herein as John Does 1-10) as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[4]

35.      Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendants and any fiduciary of the Plan and their immediate family members, who were participants in or beneficiaries of the Iowa Health System Section 401(k) Retirement

---

[4] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g., In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

Savings Plan at any time between February 3, 2020 to the date of judgment (the "Class Period").[5]

36.     The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 34,138 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500, at 2.

37.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are a fiduciary of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     The proper form of equitable and injunctive relief; and

D.     The proper measure of monetary relief.

39.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no

---

[5] Plaintiffs reserve their right to seek modification of the close of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

42.     The Plan was originally established on January 1, 2001. *See* Plan Doc., at 1 ("The Iowa Health System Retirement Section 401(k) Retirement Savings Plan (the "Plan"), established on January 1, 2001, …").

43.     "The Plan has been established so that eligible employees may have an additional source of retirement income." Plan Doc., at 1; *see also* SPD, at 1 ("The Iowa Health System (UnityPoint Health) has established this Section 401(k) Retirement Savings Plan (the "Plan") to provide retirement and financial benefits for the eligible employees.").

44.     Employees are generally eligible to participate in the Plan once they reach the age of nineteen. *See* SPD, at 3 ("You will be eligible to participate in the Plan if you are employed as a Qualified Employee and have attained age nineteen (19).").

45.     There is an automatic enrollment feature of the Plan. *See* SPD, at 4 ("Effective July 1, 2015, you will become a "participant" in the Plan on the first day of your Participating Employer's payroll period which begins coincident with or immediately following the later of: (a) your date of hire, or (b) the date that you satisfy the eligibility requirements discussed above.").

46.     Included in the Plan's available funds was the Lincoln National GIC.

47.     At the end of 2020, $87,842,770 in Plan assets were invested in the Lincoln National GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2020, attached to 2020 Form 5500 for the Plan, at 16.

48.     By the end of 2024, over $62 million in Plan assets were invested in the Lincoln National GIC. *See* Schedule of Assets (Held at the end of Year) as of December 31, 2024, attached to 2024 Form 5500 for the Plan, at 16.

49.     The chart below demonstrates the amount of Plan assets invested in the Lincoln National GIC during the Class Period.

| Plan Year | Plan Assets in Lincoln National GIC |
|---|---|
| 2020 | $87,842,770 |
| 2021 | $81,506,918 |
| 2022 | $87,282,212 |
| 2023 | $68,559,079 |
| 2024 | $62,404,548 |

**VI.  THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER**

**A.  ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments**

50.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

51.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

52.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

53.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

54.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."),

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

55.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

56.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

57.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

58.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

59.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

60.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

61.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those

written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

62.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

63.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Plan administrator to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto" and "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," as well as any committee's meeting minutes. This request was made on October 22, 2025.

64.     By letter dated November 21, 2025, the Plan's administrator responded to Plaintiffs' request. No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the Lincoln National GIC provided.

65.     Reviewing meeting minutes and investment policy statements, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case

to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

66.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

67.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Lincoln National GIC in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Lincoln National GIC**

**1.    Overview of GICs**

68.    For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

69.    GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

70.    There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

15

71.    Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates.

72.    And General account products, such as the Lincoln National GIC,[7] where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs. Consequently, general account GICs offer the highest rates.

73.    Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

### 2.    The Plan's Inclusion of Lincoln National GIC

74.    At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Lincoln National GIC.

75.    The Insurance Companies establish the crediting rates for their underlying GICs with the Plan.

76.    The Form 5500 Auditors' Notes state as follows:

> The Plan has a traditional fully benefit-responsive guaranteed investment
> contract with Lincoln National Life Insurance Company (Lincoln). Lincoln
> maintains the contributions in a general account. The account is credited

---

[7] *See* Auditors' Report, attached to 2024 Form 5500 for the Plan, at 13 ("The Plan has a traditional fully benefit-responsive guaranteed investment contract with Lincoln National Life Insurance Company (Lincoln). ***Lincoln maintains the contributions in a general account***.") (emphasis added).

with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. The guaranteed investment contract issuer is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan. The crediting rate is based on a formula established by the contract issuer but may not be less than 1%. *The crediting rate is reviewed on a quarterly basis for resetting*. *The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date*.

*This contract meets the fully benefit-responsive investment contract criteria and therefore is reported at contract value.* Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the plan. Contract value, as reported to the Plan by Lincoln, represents contributions made under the contract, plus earnings, less participant withdrawals, and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.

*The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations*. The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments.

Certain events might limit the ability of the Plan to transact at contract value with the issuer. Such events include (1) amendments to the Plan documents (including complete or partial Plan termination or merger with another plan), (2) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions, (3) bankruptcy of the Plan Sponsor or other Plan Sponsor events (for example, divestitures or spin-offs of a subsidiary) that cause a significant withdrawal from the Plan, (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA, or (5) premature termination of the contract. *No events are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants*.

In addition, certain events allow the issuer to terminate the contract with the Plan and settle at an amount different from contract value. Such events include (1) an uncured violation of the Plan's investment guidelines, (2) a breach of material obligation under the contract, (3) a material misrepresentation, and (4) a material amendment to the agreement without the consent of the issuer.

17

77. For these reasons, the Lincoln National GIC's crediting rates can be compared to other GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The Lincoln National GIC's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Lincoln National GIC, therein making risk considerations equivalent. The Comparator GIC below meets these requirements.

78. Defendants' selection of the imprudent Lincoln National GICs was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

79. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

80. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plan, but were not selected by Defendants.

81. As a representative example, one of these comparisons include:

> Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Lincoln National GIC, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

82.     The Lincoln National GIC in the Plan had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

83.     Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

### a.     The Lincoln National GIC performed poorly when compared to the Comparator Fund at the Start of the Class Period

84.     In 2020, the GIC offered in the Auto-Owners Insurance Company Retirement Savings Plan performed much better than the Lincoln National GIC. Specifically, the GIC offered in the Auto-Owners Insurance Company Retirement Savings Plan had a calculated crediting rate of 3.07%. The average calculated crediting rate for the Lincoln National GIC was 1.87% in 2020.

85.     The table below demonstrates the underperformance of the Lincoln National GIC compared to the Comparator Fund.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|---------------------|-------------|-------------------|----------------|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | **Iowa Health Plan** | **37,944** | **$2,866,617,144** | **Lincoln National** | **1.87%** |

86.     In 2020, the Lincoln National GIC underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 39.09%.

87.    Additionally, the Lincoln National GIC underperformed other GICs with similar characteristics as the Lincoln National GIC in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Iowa Health Plan** | **37,944** | **$2,866,617,144** | **Lincoln National** | **1.87%** |

**b.    The Lincoln National GIC's Poor Performance Continued through 2021**

88.    As demonstrated in the table below, the Lincoln National GIC's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | **Iowa Health Plan** | **36,716** | **$3,188,535,454** | **Lincoln National** | **1.81%** |

89.    In 2021, the Lincoln National GIC underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 40.07%.

90.     Additionally, the Lincoln National GIC underperformed other GICs with similar characteristics as the Lincoln National GIC in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Iowa Health Plan** | **36,716** | **$3,188,535,454** | **Lincoln National** | **1.81%** |

### c.     The Comparator Fund Outperformed the Lincoln National GIC in 2022

91.     As demonstrated in the table below, the Lincoln National GIC's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | **Iowa Health Plan** | **37,245** | **$2,684,422,851** | **Lincoln National** | **1.89%** |

92.     In 2022, the Lincoln National GIC underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 38.64%.

93.    Additionally, the Lincoln National GIC underperformed other GICs with similar characteristics as the Lincoln National GIC in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Iowa Health Plan** | **37,245** | **$2,684,422,851** | **Lincoln National** | **1.89%** |

    **d.**  **The Lincoln National GIC's Poor Performance Continued through 2023**

94.    As demonstrated in the table below, the Lincoln National GIC's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | **Iowa Health Plan** | **35,473** | **$2,955,694,779** | **Lincoln National** | **2.58%** |

95.    In 2023, the Lincoln National GIC underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 25.86%.

96.    Additionally, the Lincoln National GIC underperformed other GICs with similar characteristics as Lincoln National GIC in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Iowa Health Plan** | **35,473** | **$2,955,694,779** | **Lincoln National** | **2.58%** |

  e. **The Comparator Fund Outperformed the Lincoln National GIC in 2024**

97. In 2024, the Comparator Fund outperformed the Lincoln National GIC.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | **Iowa Health Plan** | **35,473** | **$2,955,694,779** | **Lincoln National** | **2.54%** |

98. In 2024, the Lincoln National GIC underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 25.29%.

99. Additionally, the Lincoln National GIC underperformed other GICs with similar characteristics as the Lincoln National GIC in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |

| | | | | |
|---|---|---|---|---|
| **Iowa Health Plan** | **35,473** | **$2,955,694,779** | **Lincoln National** | **2.54%** |

100.    Throughout the Class Period, the Lincoln National GIC underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by an average of over 33% as demonstrated in the table below.

| Year | Lincoln National GIC Rate of Return | Comparator Rate of Return | Lincoln National GIC Percentage of Underperformance |
|---|---|---|---|
| 2020 | 1.87% | 3.07% | 39.09% |
| 2021 | 1.81% | 3.02% | 40.07% |
| 2022 | 1.89% | 3.08% | 38.64% |
| 2023 | 2.58% | 3.48% | 25.86% |
| 2024 | 2.54% | 3.40% | 25.29% |
| Average Underperformance during Class Period | | 33.79% | |

101.    The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Lincoln National GIC's dismal crediting rate.

102.    Again, the specific Comparator Fund used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Fund was fully benefit-responsive and its crediting rates were regularly reviewed in the same prevailing marketplace and economic circumstances as the Lincoln National GIC.

103.    In short, because the Plan held between $2.6 billion and $3.4 billion in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

104.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Lincoln National and other providers of stable value investments.

105.    By selecting the Lincoln National GIC with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

106.    With the significant amount of assets under management in the Lincoln National GIC, the losses suffered by Plan participants were devastating.  Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[8]

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (Against Committee Defendants)

107.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

108.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

---

[8] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

109.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

110.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

111.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan's participants would have had more money available to them for their retirement.

112.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

113.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Company Defendant)**

114. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

115. Iowa Health (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

116. In light of this authority, the Monitoring Defendant had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

117. The Monitoring Defendant also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendant.

118. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things:

    (a) Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions; and

    (b) failing to remove Committee members whose performance were inadequate, all to the detriment of the Plan and Plan's participants' retirement savings.

119. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had the Monitoring Defendant complied with its fiduciary

28

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

120.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: February 3, 2026                         Respectfully submitted,

*/s/ Stephanie Hinz*
Stephanie Hinz  AT0003506
**PICKENS, BARNES & ABERNATHY**
1800 First Avenue, NE
Suite 200
Cedar Rapids, IA  52407
Email:  Shinz@pbalawfirm.com
Tel.: (319) 366-7621

Mark K. Gyandoh, Esquire
James A. Maro, Esquire
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200

*Counsel for Plaintiffs and the Putative Class*