**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| ELLEN HARRISON, JASMINE CARBER, KRISTINE SEXTON, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | **CIVIL ACTION NO.**: 4:26-CV-00055- |
| | ) | SHL-WPK |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| IOWA HEALTH SYSTEM d/b/a | ) | |
| UNITYPOINT HEALTH, THE IOWA | ) | |
| HEALTH SYSTEM BENEFITS | ) | |
| COMMITTEE, and JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO**

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................1

II.    BACKGROUND ........................................................................................................1

     A.     Defendants Failed to Monitor the LNG .......................................................2

     B.     Defendants Engaged in Numerous Prohibited Transactions ..................................5

III.   THE AC IS SUFFICIENT ........................................................................................6

     A.     Standard of Review......................................................................................6

     B.     Defendants Ignore Plaintiffs' Imprudent Process Theory .......................................7

     C.     The Benchmarks are Meaningful Pursuant to Eighth Circuit Precedent .................9

     D.     The Extent of Underperformance was Significant....................................................15

     E.     The Prohibited Transaction Claim is Sufficient.......................................................17

     F.     Defendants Breached Their Duty to Monitor ..........................................................20

IV.   CONCLUSION.........................................................................................................20

**TABLE OF AUTHORITIES**

PAGE(S)

**Cases**

*Allen v. GreatBanc Tr. Co.*,
835 F.3d 670, 680 (7th Cir. 2016) ................................................................ 15, 19

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) ..................................................................... 17

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ...............................................................*Passim*

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018) ..................................................................... 17

*Bugielski v. AT&T Servs., Inc.*,
76 F.4th 894 (9th Cir. 2023) ................................................................... 18

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ............................................................. 7, 9, 10

*Carter v. Sentara Healthcare Fiduciary Comm.*,
No. 25-cv-16, 2025 WL 2427614 (E.D. Va. Aug. 11, 2025) ("*Carter I*") ............................. 7, 16

*Carter v. Sentara Healthcare Fiduciary Comm.*,
No. 25-cv-16, 2026 WL 252616 (E.D. Va. Jan. 30, 2026) ("*Carter II*") ...................................... 8

*Clinton v. Baxter Int'l Inc.*,
No. 25-CV-3368, 2025 WL 3470685 (N.D. Ill. Dec. 3, 2025) ....................................8, 11, 14, 15

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025) ........................................................................ 8, 19

*Davis v. Stadion Money Mgmt., LLC*,
No. 19-CV-556, 2020 WL 1248580 (D. Neb. Mar. 16, 2020) ...........................................11, 15, 16

*Disselkamp v. Norton Healthcare, Inc.*,
No. 18-cv-00048, 2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) ................................................. 7, 8

*D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*,
88 F.4th 602 (5th Cir. 2023) ................................................................. 19

*Doll v. Evergy, Inc.*,
No. 25-CV-00043, 2025 WL 4042583 (W.D. Mo. Sept. 10, 2025) ........................................... 17

ii

*Eibensteiner v. Essilorluxottica USA Inc.*,
No. 3:25-CV-2443, 2026 WL 1140895 (N.D. Tex. Apr. 27, 2026)........................................ 12, 19

*England v. DENSO Int'l Am., Inc.*,
No. 22-11129, 2023 WL 4851878 (E.D. Mich. July 28, 2023)...................................... 17

*Fezer v. Lockheed Martin Corp.*,
No. 25-CV-0908, 2026 WL 1041276 (D. Md. Apr. 16, 2026)................................... 16, 19

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)...................................................................................... 6

*Garnick v. Wake Forest Univ. Baptist Med. Ctr.*,
629 F. Supp. 3d 352 (M.D.N.C. 2022)..................................................... 13

*Grink v. Virtua Health, Inc.*,
812 F. Supp. 3d 434 (D.N.J. 2025) ....................................................... 12

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ("*Hughes I*")................................................. 6, 7, 15

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023).................................................................. 14

*Johnson v. Parker-Hannifin Corp.*,
122 F.4th 205 (6th Cir. Nov. 20, 2024) .................................................*Passim*

*Jones v. DISH Network Corp.*,
No. 22-CV-00167-CMA-STV, 2023 WL 7458377 (D. Colo. Nov. 6, 2023) .............................. 17

*Krueger v. Ameriprise Fin., Inc.*,
No. 11-CV-02781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) ................................. 20

*Lacrosse v. Jack Henry & Assocs.*,
No. 23-cv-05088, 2024 WL 3564575 (W.D. Mo. July 11, 2024) ....................................10, 11, 12

*Lalonde v. Mass. Mut. Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. 2024) ................................................. 14, 17

*Lau v. Metropolitan Life Insurance Co.*,
No. 15-CV-09469, 2016 WL 5957687 (S.D.N.Y. Aug. 22, 2016)................................. 12

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022)..................................................................9, 11

*McDonald v. Lab'y Corp. of Am. Holdings*,
No. 22CV680, 2023 WL 4850693 (M.D.N.C. July 28, 2023)...................................................... 13

*McWashington v. Nordstrom, Inc.*,
2025 U.S. Dist. LEXIS 118739 (W.D. Wash. June 23, 2025)...................................................... 14

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ................................................................................................9, 11

*Midwest Med. Sols., LLC v. Exactech U.S., Inc.*,
95 F.4th 604 (8th Cir. 2024) ..................................................................................................... 20

*Miller v. AutoZone, Inc.*,
No. 19-cv-02779, 2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ......................................*Passim*

*Moitoso v. FMR LLC*,
451 F. Supp. 3d 189 (D. Mass. 2020) ....................................................................................... 13

*Nelsen v. Principal Glob. Invs. Tr. Co.*,
362 F. Supp. 3d 627 (S.D. Iowa 2019)....................................................................................... 13

*Olson v. Bank of Am., N.A.*,
518 F. App'x 488 (8th Cir. 2013) ............................................................................................... 9

*Payne v. Hormel Foods Corp.*,
24-CV-545, 2024 WL 4228613 (D. Minn. Sept. 18, 2024).....................................................*Passim*

*Pizarro v. Home Depot, Inc.*,
2019 WL 11288656 (N.D. Ga. Sept. 20, 2019) ("*Pizarro I*")................................................. 14, 16

*Pizarro v. Home Depot, Inc.*,
111 F.4th 1165 (11th Cir. 2024) ("*Pizarro II*") ........................................................................ 15, 16

*Ramos v. Banner Health*,
1 F.4th 769 (10th Cir. 2021).................................................................................................... 18, 19

*Rodriguez v. Hy-Vee, Inc.*,
No. 422CV00072, 2022 WL 16648825 (S.D. Iowa Oct. 21, 2022)......................................*Passim*

*Sellers v. Anthem Life Ins. Co.*,
316 F. Supp. 3d 25 (D.D.C. 2018) ............................................................................................ 19

*Somers v. Cape Cod Healthcare, Inc.*,
No. 23-cv-12946, 2024 WL 4008527 (D. Mass. Aug. 30, 2024)................................................ 16

iv

*Stark v. Keycorp.,*
2021 WL 1758269 (N.D. Ohio May 4, 2021) ................................................................. 12

*Stegemann v. Gannett Co.*, Inc.,
970 F.3d 465 (4th Cir. 2020) ....................................................................................... 2

*Sweeney v. Nationwide Mut. Ins. Co.,*
No. 20-CV-1569, 2026 WL 352845 (S.D. Ohio Feb. 9, 2026) ........................... 2, 10, 19

*Teodosio v. DaVita, Inc.,*
684 F. Supp. 3d 1117 (D. Colo. 2023) ......................................................................... 13

*Thomson v. Caesars Holdings Inc.,*
661 F. Supp. 3d 1043 (D. Nev. 2023) .......................................................................... 14

*Tibble v. Edison Int'l,*
575 U.S. 523, (2015) ("*Tibble I*") ......................................................................... 2, 8, 16

*Tibble v. Edison Int'l,*
843 F.3d 1187 (9th Cir. 2016) ("*Tibble II*") ............................................................. 3, 16

*Tussey v. ABB, Inc.,*
746 F.3d 327 (8th Cir. 2014) ("*Tussey I*") ........................................................ 3, 7, 8, 13

*Tussey v. ABB, Inc.,*
850 F.3d 951 (8th Cir. 2017) ("*Tussey II*") .................................................................. 8

*In re Unisys Sav. Plan Litig.,*
74 F.3d 420 (3d Cir. 1996) ("*Unisys*") ................................................................. 3, 8, 10

*Wehner v. Genentech, Inc.,*
No. 20-cv-6894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ...................................... 13

*Wood v. Prudential Ret. Ins.,*
No. 15-cv-1785, 2016 WL 5940946 (D. Conn. Sept. 19, 2016) ("*Wood I*") ......... 8, 11, 12

**Statutes**

9 U.S.C. § 1106(a)(1) .................................................................................................... 5

**Other Sources**

Black's Law Dictionary (12th ed. 2024) ....................................................................... 5

The Employee Retirement Income Security Act of 1974 ........................................*Passim*

Plaintiffs, on behalf of the Iowa Health System Section 401(k) Retirement Savings Plan (the "Plan"), respectfully submit this Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, and supporting Memorandum. Dkt. No. 19 ("MTD").

## I.    INTRODUCTION

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), the fiduciary duty to act with "care, skill, prudence, and diligence" is "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). The heart of Plaintiffs' prudence claim is that Defendants' retention of the "LNG" (a guaranteed investment contract ("GIC") with Lincoln National Life Insurance Company ("Lincoln")), "was clearly a result of their lack of an investment review process, or at" least, "a prudent" one, based on several supporting factors. Dkt. 10, Amended Class Action Complaint ("AC"), ¶ 68. In particular, Defendants failed to act on knowable information and take available actions to ensure that the LNG was receiving guaranteed rates commensurate with its level of risk and bargaining power. Plaintiffs also allege a prohibited transaction claim, wherein Defendants caused the Plan to pay excessive recordkeeping compensation to Fidelity, who was a party-in-interest during the Class Period.

Defendants' arguments for dismissal repeatedly: (1) ignore key allegations; (2) insist Plaintiffs allege inside information that Defendants refused to provide; and (3) rely on misrepresenting authorities that actually *rejected* Defendants' position. For these reasons and more, Plaintiffs request that Defendants' motion to dismiss be denied.

## II.    BACKGROUND

Before suing, Plaintiffs requested numerous documents under ERISA § 104(b)(4). AC ¶ 83. Defendants never produced any "meeting minutes, to the extent they exist" or "the investment

management contract for the Lincoln National GIC" as requested. *Id*. ¶¶ 84-85. Inferences of Defendants' processes are based upon "several factors" and publicly available sources. *Id*. ¶ 86.

### A.      Defendants Failed to Monitor the LNG

Plaintiffs do not simply claim underperformance. Rather, Defendants failed to act in accordance with the prevailing standard of care for monitoring the LNG in a myriad of ways. AC ¶¶ 91-92, 124, 130-31. GICs, or Stable Value Funds ("SVFs"), "by nature, are different from other types of investment options" because they do not have any publicly filed prospectuses, and "are defined by their predictability;" "their associated risk level is a creature of their structural design rather than their investment strategy." *Payne v. Hormel Foods Corp.*, No. 24-CV-545, 2024 WL 4228613, at *6 (D. Minn. Sept. 18, 2024); AC ¶¶ 60-62.[1] "Unlike funds that premise return on the performance of underlying investments, the [LNG] is a contract between the Plan and an insurance company" and "General GICs," like the LNG, "are the riskiest" type of GIC. MTD at 4-5; AC ¶¶ 62-65. General account GICs' highest risk profiles should be compensated by higher rates. *Payne*, 2024 WL 4228613, at *12; AC ¶¶ 102, 130-31. For general account GICs, the insurer earns a spread; "[i]f the spread goes down, the Crediting Rate goes up." *Sweeney v. Nationwide Mut. Ins. Co.*, No. 20-CV-1569, 2026 WL 352845, at *9, 17 (S.D. Ohio Feb. 9, 2026); *see also* AC ¶ 17.

"Once fiduciaries have […] added an investment to a plan, there is a 'continuing duty to monitor' that investment." *Stegemann v. Gannett Co.*, Inc., 970 F.3d 465, 474–75 (4th Cir. 2020) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) ("*Tibble I*")). "What counts as an imprudent investment that must be removed depends on the circumstances." *Id*. In all circumstances, however, an ERISA fiduciary "cannot ignore the power the trust wields to obtain

---

[1] Plaintiffs reference the ERISA Advisory Council Report ("EACR") only to note general characteristics at the core of every GIC. *See* AC, ¶¶ 59-60 nn.8-10.

2

favorable investment products." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("*Tibble II*"). Because investment losses compound, fiduciaries compare relative performance, rather than just absolute performance. *Id*. ¶¶ 103, 129 (citing *Tibble II*, 843 F.3d at 1198). Even if fiduciaries engage an "advisor," "black letter law" mandates that fiduciaries "conduct an 'independent investigation into the merits of a particular investment.'" *Id*. ¶ 79 (quoting the GIC case of *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996) ("*Unisys*")). "It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors." *Id*. ¶ 80; *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 331 (8th Cir. 2014) ("*Tussey I*"). Likewise, the adoption of an IPS is not concrete evidence of prudence because a court may find fiduciary breaches "independent of the IPS" (*id.* at 334 n.5), and the failure to "comply with" the IPS can indicate imprudence. AC ¶ 81 (citation omitted).[2]

Given the competitive marketplace for GICs, their contractually defined rates, and the circumstances of the LGN's structure and Plan's size, a fiduciary following the standard of care would have investigated the marketplace, solicited competitive bids, negotiated for better rates using the Plan's tremendous size, and reacted to the LNG's below market rates, particularly considering the LNG's uncompensated risk. *Id*. ¶¶ 10-15, 56-58, 73, 90-92, 97, 124, 130-31. The LNG's terms provided an opportunity to renegotiate better rates "every three months leading up to and during the Class Period" and permitted participant withdrawals at book value to invest in alternative SVFs. *Id*. ¶ 93. Despite the ability to do so, and knowable information about the LNG's unreasonable rates, Defendants failed to take these steps. *Id*. ¶ 91.

---

[2] That appears to be the case here. The Plan's IPS states that each fund should "provid[e] a competitive return" and underperformance as short as "two consecutive quarters" as measured on a "1-year, 3-year, or 5-year annualized" basis warrants heightened scrutiny. Dkt. 19-4 at 5, 8-9.

The 2024 Auditor's Report describes the LNG as "fully benefit-responsive" where "[t]he crediting rate is reviewed on a quarterly basis for resetting" and there is no insurer right to early termination, and no probable events that would limit contract-value transactions. *Id*. ¶ 65. Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment for market value. *Id*. ¶ 66. Plaintiffs' GIC "Comparators" have, among other aspects, the same withdrawal and terminations terms, creditworthy carriers, and unlikelihood of events limiting contract-value transactions. *Id*. ¶¶ 94, 122. The AC uses interrelated comparisons, including several individual "Comparators" that repeat every year of the Class Period (including General/traditional GICs), and other GICs paired with the "SVIA Index" to demonstrate that the Comparators are not cherrypicked but rather had a lower average return than the prevailing marketplace. *Id*. ¶¶ 125-28. The AC incorporates language from Form 5500s to demonstrate comparability because contracts for GICs are not publicly available. *Id*. ¶ 100. Several Comparators demonstrate that the insurers offered better rates to unaffiliated plans than their own plans, and several plans also had Lincoln National Life Insurance Co. (or, d/b/a/ "Lincoln Financial Group"[3]) as their provider, like the Plan. *Id*. ¶¶ 107, 110, 113, 116. Every non-proprietary plan, where the insurance company was not the sponsor of the plan, had higher rates than what Lincoln provided to the Plan. *Id*. ¶¶ 105-19.

Across every year of the Class Period, the LNG consistently and materially underperformed the Comparators. On average, the LNG underperformed the Comparators by 40.88%. *Id.* ¶¶ 104-20. The sustained, dramatic disparities between rates in all years demonstrate that any purported difference in the GICs cannot explain the different outcomes. *Id.* ¶ 121.

---

[3] *See* https://www.lincolnfinancial.com/public/aboutus/companyoverview/whoweare; AC, ¶¶ 107, 110, 113, 116.

Plaintiffs also include the "SVIA Index", which reflects the broader market at 135,000 plans, to show that the Comparators' rates are actually below the overall marketplace's rates, and *still* exceeded the LNG's average return, even though the Plan is larger than the plans in the SVIA Index and the Lincoln GIC had the riskiest GIC profile. *Id*. ¶¶ 120-27. The AC alleges available, historical marketplace data Defendants could have uncovered and should have reacted to.

**B.    Defendants Engaged in Numerous Prohibited Transactions[4]**

ERISA prohibits any "transaction" that "constitutes a direct or indirect […] exchange […] between the plan and a party in interest" and/or the "transfer to, or use […] of any assets of the plan." § 406(a)(1), 29 U.S.C. § 1106(a)(1)[5]; *see also* AC ¶ 176. "*During the Class Period, Defendants entered* into a contract with Fidelity to provide, among other things, [recordkeeping] services" where "such engagements and *subsequent services* provided by Fidelity constitute prohibited transactions under ERISA." AC ¶ 132. Defendants filed with the DOL and IRS that "Fidelity is the trustee as defined by the Plan and, therefore, the investment transactions qualify as party-in-interest transactions." *Id*. ¶ 20 n.5 (quoting the Auditor's Report, attached to the 2024 Form 5500 for the Plan). Although not a legal prerequisite, the AC alleges that "Fidelity was a party-in-interest" based on separate and "*additional sources of income*" it received from the Plan, *id*. ¶ 148, such as "compensation from *trustee* services" and "compensation for

---

[4] At certain points before the Class Period, Lincoln was listed as a party-in-interest in the Form 5500s based on its role as custodian and other GIC contracts in the Plan existing before the instant contract (*see* Exhibit 2, IOWA00006), including contracts with different terms (such as different minimum guaranteed rates ). *Compare* Exhibit 1, IOWA00002; Exhibit 3, IOWA00009; AC, ¶ 65. At this time, it is unclear to the extent and basis that Lincoln was a party-in-interest, as designated by the Form 5500s, so Plaintiffs are no longer pursuing Count III at this time, but reserve the right to amend their AC should discovery provide further information.

[5] Black's Law Dictionary defines "Transaction" as (1): "The act or an instance of conducting business or other dealings" including the "performance, or discharge of a contract" or an "*exchange*." TRANSACTION, Black's Law Dictionary (12th ed. 2024).

managing/maintaining the Plan's investments in Fidelity's funds." *Id*. ¶ 134. The Form 5500 states that, as a "Recordkeeper," Fidelity earned sub-transfer agency fees (code 60) and securities brokerage commissions and fees (code 71), but no codes for trustee and custodian services are listed in that section. Dkt. 19-5 at 152; *see also* Dkt. 9-4 at 12-74 (listing all of the investments for which Fidelity, the "recordkeeping services" provider, received "indirect compensation.").

Though the Class Period started in 2020 (AC ¶ 44), Defendants attempt to paint a different picture using 2015 and 2016 Form 5500s. Subsequent years before and during the Class Period show that the products Fidelity provided to the Plan wherein Fidelity was denoted as a "party-in-interest" changed and grew. *Compare* Exhibit 3, IOWA00003 (2017 Form 5500); Dkt. 19-5 at 246.

## III.    THE AC IS SUFFICIENT

### A.    Standard of Review

"In ruling on the Motion to Dismiss, the Court construes the facts in the light most favorable to Plaintiffs." *Rodriguez v. Hy-Vee, Inc.*, No. 422CV00072, 2022 WL 16648825, at *1 n.1 (S.D. Iowa Oct. 21, 2022) (Locher, J.). ERISA does not have a "defense-friendly standard" or "presumption of prudence." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014). Courts "[]evaluate the allegations as a whole" using a "context specific" approach. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) ("*Hughes I*"). ERISA "focuses on the fiduciary's conduct preceding the challenged decision.'" *Braden*, 588 F.3d at 595. However, "[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences,]" and therefore courts "must also take account of their limited access to crucial information" or else "the crucial rights secured by ERISA will suffer." *Id.* at 598. Thus, "Rule 8 does not require a plaintiff to plead facts tending to rebut all

possible lawful explanations for a defendant's conduct." *Id.* at 596; *see also Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024) (same in an ERISA case).

### B.    Defendants Ignore Plaintiffs' Imprudent Process Theory

Defendants mischaracterize Plaintiffs' claims as challenging only the LNG's underperformance while ignoring the gravamen of the AC that Defendants' deficient and/or unscrupulous processes were "not within a 'range of reasonable judgments'" fiduciaries make when monitoring a GIC. *Carter v. Sentara Healthcare Fiduciary Comm.*, No. 25-cv-16, 2025 WL 2427614, at *5 (E.D. Va. Aug. 11, 2025) ("*Carter I*") (quoting *Hughes*, 595 U.S. at 177). Like other upheld GIC complaints, Plaintiffs allege that Defendants failed to leverage the Plan's size to negotiate better contractual terms, rectify the LGN's uncompensated risk profile, conduct a competitive bidding process, and adequately monitor the marketplace. *See, e.g.*, *Payne*, 2024 WL 4228613, at *8; *Miller v. AutoZone, Inc.*, No. 19-CV-02779, 2020 WL 6479564, at **4-5 (W.D. Tenn. Sept. 18, 2020); *Disselkamp v. Norton Healthcare, Inc.*, No. 18-CV-00048, 2019 WL 3536038, at *7 (W.D. Ky. Aug. 2, 2019); AC ¶¶ 91-92, 124, 130-31. This Court and the Eighth Circuit likewise recognize that the failure to leverage "substantial bargaining power in the highly competitive" market plausibly alleges an imprudent process. *Braden*, 588 F.3d at 590; *Tussey I*, 746 F.3d at 332, 336; *Rodriguez*, 2022 WL 16648825, at *12. Also, the Fifth Circuit warned that purchasing an annuity with "uncompensated risk" can infer deficient reasoning. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298-99, 304 n.23 (5th Cir. 2000); *see* AC ¶¶ 87, 102, 122, 130.

GIC rates are "'[d]eclared in advance,'" contractually guaranteed regardless of underlying assets, reset periodically, and their risks come from structure, and the spread represents fees. Dkt. 27, The Brief of The Stable Value Investment Association ("SVIA") As *Amicus Curiae* In Support

Of Dismissal ("*Amicus*"), at 16; *Payne*, 2024 WL 4228613, at \*6, 12; MTD at 4-5; AC ¶¶ 62-65; 102, 130-31. For this precise reason, courts evaluating GIC complaints recognize that there is a plausible inference of imprudent processes using foresight, not hindsight. *See Wood v. Prudential Ret. Ins.*, No. 15-cv-1785, 2016 WL 5940946, at \*1 (D. Conn. Sept. 19, 2016) ("*Wood I*"); *Miller*, 2020 WL 6479564, at \*6; *Disselkamp*, 2019 WL 3536038, at \*8; *see also Johnson*, 122 F.4th at 220 (alleging publicly knowable information "and underperformance" presents "a 'foresight-over-hindsight perspective'" that infers a "deficient process."). Contrary to Defendants' misrepresentation, the court in *Clinton* held that allegations concerning a "process (or lack thereof)" in "retaining underperforming funds—and failing to negotiate accordingly—are process-based" inferences, not allegations of underperformance alone, nor allegations that Defendants were required to pick the best performing fund. *Clinton v. Baxter Int'l Inc.*, No. 25-CV-3368, 2025 WL 3470685, at \*5 (N.D. Ill. Dec. 3, 2025); *see also Braden*, 588 F.3d at 596 n.7.

After denying Plaintiffs' request for meeting minutes and the LNG contract, AC ¶¶ 82-85, Defendants defy precedent by demanding that Plaintiffs plead information found only in these documents and "how the Lincoln National GIC was selected." MTD at 8; *but see Braden*, 588 F.3d at 602 (rejecting such a "perverse" pleading requirement); *Cunningham v. Cornell Univ.*, 604 U.S. 693, 705 (2025) (same); *Tibble I*, 575 U.S. at 530 (ERISA imposes a continuing duty to monitor investments apart from their initial selection). The IPS and engagement of an advisor says nothing more about Defendants' processes than what *should* have been considered, not what *was* considered, and says even less about monitoring the LNG specifically. *See Tussey I*, 746 F.3d at 331, 334 n.5; *Tussey v. ABB, Inc.*, 850 F.3d 951, 957 (8th Cir. 2017) ("*Tussey II*"); *Carter v. Sentara Healthcare Fiduciary Comm.*, No. 25-CV-16, 2026 WL 252616, at 5 (E.D. Va. Jan. 30, 2026) ("*Carter II*"); *Unisys*, 74 F.3d at 436.

**C.**     **The Benchmarks are Meaningful Pursuant to Eighth Circuit Precedent**

"[T]here is 'no one-size-fits-all approach'" to pleading a meaningful benchmark. *Rodriguez*, 2022 WL 16648825, at*4 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022)). Crucially, the Eighth Circuit's standard for stating a claim considers whether there are "facts about the funds" that "plaintiffs can research," such as mutual fund prospectuses, or whether the facts are ones "plaintiffs generally lack" access to, such as GIC contracts. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822–23 (8th Cir. 2018).

Combined, "specific" comparators' rates, the general "market rate," and "bargaining power" allegations create a sufficient "inference of imprudence. *Rodriguez*, 2022 WL 16648825, at *11 (listing cases and noting the support found in "industry-wide benchmarks."); *Johnson*, 122 F.4th at 218 (indexes are meaningful in performance cases).[6] Defendants ignore Plaintiffs' allegations regarding the LNG's uncompensated risk, size-leverage, year-over-year Comparisons, and the Comparators' comparable terms and carriers, as well as the SVIA Benchmark, all of which must be viewed holistically and in Plaintiffs' favor. *See Rodriguez*, 2022 WL 16648825, at *3. The SVIA Index shows that the Comparators actually had a lower rate of return than the marketplace, yet higher than the LNG despite its bargaining power and risk. AC ¶¶ 11-15, 56-58, 123. Thus, the Comparators are not cherry picked, but actually show a conservative rate disparity for the LNG.

Defendants also ignore Plaintiffs' core allegation that ***the risk-reward tradeoff of the LNG did not actualize***. AC ¶¶ 87, 102, 122, 130. However, Defendants agree that "[g]eneral [or traditional account] GICs" such as the LNG, "are the riskiest," and "investments" that "pay off less" should have "lower risk." MTD at 5, 10. Alleging that, as a general account GIC, the LNG

---

[6] Defendants' failure to address the SVIA Benchmark and uncompensated risk allegations means that Defendants waive any arguments in their reply. *See Olson v. Bank of Am., N.A.*, 518 F. App'x 488, 491 n.3 (8th Cir. 2013).

was "the riskiest type of stable value fund and consequently must offer the highest credit rates" is sufficient to account for alleging risk and unreasonable rates in the GIC context. *Miller*, 2020 WL 6479564, at *5-6; *see also Payne*, 2024 WL 4228613, at *6-7; *Lacrosse*, 2024 WL 3564575, at *3. Plaintiffs allege even more by including several general/traditional account Comparators as well as Comparators with less bargaining power and risk, but better rates. *Id*. ¶¶ 11-15, 56-58, 87, 102, 122-23, 130.[7] SVIA's arguments about Lincoln's solvency and agency rating is the same red herring rejected by the Fifth Circuit in *Bussian*. Risk relates to "the *structure*" of the product, and ratings merely "reflect an agency's evaluation of a company" not a "product," while varying in reliability, "recency," and credibility in the "industry." *Bussian*, 223 F.3d at 301–02; *see also Unisys*, 74 F.3d at 436-37 ("the financial condition of" the insurer is an issue for trial). The LGN is structured so that should Lincoln become insolvent, the assets of the LGN are not protected from creditors, warranting a higher premium. *See Payne*, 2024 WL 4228613, at *1.

The costs are alleged because the LNG's "fees charged are typically implicit" in the spread, and the spread is how the "the insurance company earn[s] a profit." *Miller*, 2020 WL 6479564, at *5, 7; *see also Amicus* at 16 (rather than "'disclosed fees,' […] general-account products (and some separate-account products) use a [non-disclosed] '[s]pread'" as compensation); MTD at 5; *Sweeney*, 2026 WL 352845, at *9, 17. SVIA, which represents "insurance companies" and "banks," Dkt 21-1 at 3, note that "the insurer retains any surplus return above the crediting rate" while conveniently asking this Court to assume that all GICs are selected for "specific strategic reasons," and thus cannot be questioned. *Amicus* at 16-17. Asking this Court to accept facts not

---

[7] The SVIA believes that if plans are seeking "a strictly guaranteed rate of return" GIC, then general-account GICs, like the LNG, "might be attractive." Dkt. 27 at 17. Yet, even other GIC types had better rates than the LNG.

10

pled in Defendants' favor defies precedent. *See Braden*, 588 F.3d at 596 (whether fees justify lower-than-market rate despite all other factors is an explanation that Plaintiffs need not rebut).[8]

Plaintiffs allege other factors such as withdrawal terms, structures, and event-risk protections ¶¶ 67, 95, 98-100, 122, to the extent knowable and relevant, which is all that Rule 8 requires. *See Braden*, 588 F.3d at 602; *see also* MTD at 11-12 (admitting that Plaintiffs allege similarities by citing AC ¶ 100). Defendants flagrantly misrepresent their sources. First, the court in *Clinton* actually *rejected* the premise that plaintiffs must allege how "assets are held, the exit provisions[…,] protections […], the methodology for determining crediting rates, or any of the other factors," because any "differences […] and their relevance" are premature fact disputes. *Clinton*, 2025 WL 3470685, at *5-6. In doing so, the court sided with "[c]ourts in the Eighth Circuit." *Id*. at *6; *see also Payne*, 2024 WL 4228613, at *6-8 ( "*Meiners*, *Davis*, and *Matousek* are instructive," but limited in the GIC context because GICs are too "different" in framing "risk" and "investment strategy."); *Lacrosse v. Jack Henry & Assocs.,* No. 23-cv-05088, 2024 WL 3564575, at **2-3 (W.D. Mo. July 11, 2024) (same, refuting arguments that plaintiffs must "allege facts about the characteristics, costs, or risks, of the TIAA Traditional Annuity beyond that it is a general account product."). Second, Defendants point to the *class certification* decision in *Wood v. Prudential Ret. Ins. Annuity Co*., No. 3:15-cv-1785, 2017 WL 3381007, at *4 (D. Conn. Aug. 4,

---

[8] Plaintiffs allege that Defendants failed to appreciate "readily available alternative" GICs based on information knowable before each quarterly reset interval, and the marketplace was offering GICs with competitive rates" based on information Defendants could have and should have known. AC, ¶¶ 87, 97. Nevertheless Plaintiffs need not allege whether the Comparators themselves were "available" to the Plan or what Defendants "knew." MTD at 14 n.6. See *Payne*, 2024 WL 4228613, at *4 n.1, 8 (rejecting the same arguments because "[w]hich investment options were [actually] available to the Plans is a question of fact."); *Lacrosse*, 2024 WL 3564575, at *3 (if the specific comparators are "unavailable […] the [comparator] fund's crediting rates are still indicative of what a reasonable crediting rate is"); *Wood I*, 2016 WL 5940946, at *1 (no hindsight bias when the GICs the "applicable interest rate is" determined "in advance[,]").

2017), when at the *pleadings* stage the court in *Wood I* actually rejected the same arguments that Defendants here make because "the benchmark and methodology used to set the interest rate, the prevailing rates for comparable investments, and other factors bearing on the reasonableness of the interest rate and the allocation of risk, are fact specific and render dismissal premature." *Wood I*, 2016 WL 5940946, at *4 (citing *Lau v. Metropolitan Life Insurance Co.*, No. 15-CV-09469, 2016 WL 5957687, at *3-5 (S.D.N.Y. Aug. 22, 2016)).[9] Indeed, courts repeatedly reject heightened demands for undisclosed particulars especially because these particulars "ha[ve] no bearing on the fund's ability to offer higher crediting rates." *Lacrosse*, 2024 WL 3564575, at *3; *see also Johnson*, 122 F.4th at 218 ("risk profile, bond-to-equity ratio, and investment strategy" are not always pleading requirements). Further supporting Plaintiffs' point that "actual performance of the underlying assets" is not necessary, MTD at 5, is the Defendants' and SVIA's concession that rates are "set and periodically reset" and "[u]nlike funds that premise return on the performance of underlying investments, the Lincoln National GIC is a contract." MTD at 4-5; *see also Amicus* at 16 (rates are "guaranteed regardless of the performance of the underlying assets.").

In *Braden*, the "Secretary of Labor, who is charged with enforcing ERISA," under the DOL, submitted an amicus brief that "expressed concern over the erection of 'unnecessarily high pleading standards'" in ERISA cases. *Braden*, 588 F.3d at 597 n.8. Also in *Braden*, the Eighth

---

[9] Defendants' other, out-of-Circuit cases are readily distinguishable, especially because they involved far less comparators and detail than here. *See, e.g.*, *Eibensteiner v. Essilorluxottica USA Inc.*, No. 3:25-CV-2443, 2026 WL 1140895, at *3 (N.D. Tex. Apr. 27, 2026) (requiring nondisclosed contract terms and lacking the number of year-over-year comparators and SVIA Index); *Laabs v. Faith Techs., Inc.*, No. 20-CV-1534, 2023 WL 9321358, at *8 (E.D. Wis. Aug. 30, 2023) (the complaint only "vaguely" alleged a "range" of crediting rates for "just a single comparator."). They also had different theories of imprudence. *See Grink v. Virtua Health, Inc.*, 812 F. Supp. 3d 434, 442 (D.N.J. 2025) (challenging the decision to use an "unreasonably" risky GIC, not the level of rate in relation to risk); *Stark v. Keycorp.*, 2021 WL 1758269, at *3, 11-21 (N.D. Ohio May 4, 2021) ("Key improperly used the Plan to try to prop up the [] Fund.").

12

Circuit cautioned courts not to require the pleading of nondisclosed information and instructing that alternative "reasons appellees chose the challenged" fund is "not [plaintiff's] responsibility to rebut." *Id.* at 597; *see also Nelsen v. Principal Glob. Invs. Tr. Co.*, 362 F. Supp. 3d 627, 641 (S.D. Iowa 2019). Hence, Defendants' third misrepresentation is that the Eighth Circuit and the "DOL" require such "rigor" beyond what Plaintiffs have alleged at the pleading stage, MTD at 12, especially because the EACR states that "[t]he contents of this *report do not represent the position of the Department of Labor* [*DOL*]" and warns of the nontransparency of GICs.

Defendants' contention that some comparators are not meaningful because they involve an insurer's own plan is worse than speculative; it is disproven by the AC. The same insurers allegedly offered other plans better rates than their own, and Comparators—where the insurance company was not the sponsor of the plan—had higher rates than the LNG. AC ¶ 110. Plus, some of the "alternatives" are also Lincoln's "own investment options" in other plans. *Nelsen*, 362 F. Supp. 3d at 641; *see also Payne*, 2024 WL 4228613, at *2.[10] Defendants' argument that just "one non-insurance comparator" was smaller is thus not incomparable, and there are far more than one Comparator involving  unaffiliated plans, and the smaller size reinforces Plaintiffs' theory that plans with less bargaining power received better rates. MTD at 12; *see also Braden*, 588 F.3d at 590; *Tussey I*, 746 F.3d at 332, 336; *Rodriguez*, 2022 WL 16648825, at *12.

---

[10] Defendants misrepresent the case of *Wehner v. Genentech, Inc.*, No. 20-cv-6894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021), where the court rejected a comparison based on Fidelity' stipulation that it charged its own plan roughly 14 times more than it would charge for the same recordkeeping products to similarly sized unaffiliated plans. *See Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 209 (D. Mass. 2020). However, this Court and many others have accepted the use of the same stipulation. *See*, *e.g.*, *Rodriguez*, 2022 WL 16648825, at *11; *McDonald v. Lab'y Corp. of Am. Holdings*, No. 22CV680, 2023 WL 4850693, at *6 (M.D.N.C. July 28, 2023); *also Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 364 (M.D.N.C. 2022); *Teodosio v. DaVita, Inc.*, 684 F. Supp. 3d 1117, 1127 (D. Colo. 2023).

Defendants' and SVIA's "cherry-picking" arguments, MTD at 13, are foreclosed by caselaw and the allegations they ignore. *See Rodriguez*, 2022 WL 16648825, at \*10 (rejecting "Defendants and *Amicus Curiae*" "cherry pick[ing]" attacks); *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1056–57 (D. Nev. 2023) ("[N]o authority requir[es] plaintiffs to allege their claim of imprudence by demonstrating that the challenged funds were markedly worse than every possible comparator."). Plaintiffs allege at least five GICs repeating year-over-year, not "different GICs each year," MTD at 13[11], plus many other Comparators repeat over the years.[12] AC ¶¶ 100-01, 105-19. The number of Comparators and SVIA Index exceed the number of comparisons alleged in other cases, including Defendants' case of *Lalonde*. MTD at 13 (quoting *Lalonde v. Mass. Mut. Ins. Co.*, 728 F. Supp. 3d 141 (D. Mass. 2024) which had only two comparators)); *but see Payne*, 2024 WL 4228613, at \*2 (disagreeing with *Lalonde* and upholding a complaint using two comparators); *Hughes*, 63 F.4th at 632 (four comparators sufficient). In *Rodriguez,* this Court upheld the use of "seven" comparators and rejected similar arguments where, like here, the defendants "criticize[d] Plaintiffs for not picking the right comparators" based on granular aspects, while "criticiz[ing] [Plaintiffs] for not picking enough comparators" despite that plan's size giving it much better bargaining power than "99.9%+" of the marketplace, just like the size of the Plan here. *Rodriguez,* 2022 WL 16648825, at \*10; *see also* AC ¶ 12.

Similarly, cases have rejected arguments about "long-range investment strateg[ies]" for GICs, especially at the pleading stage. *Pizarro v. Home Depot, Inc.*, 2019 WL 11288656, at \*2-4

---

[11] Of course, Defendants incorrect argument also debunks Defendants' strawman that Plaintiffs "expect Defendants to hop between GICs year-to-year." MTD at 13.

[12] Plaintiffs' Comparators that repeat *every* year are dissimilar from Defendants' case of *McWashington*, where the complaint compared "amounts across multiple years to single-year," *McWashington v. Nordstrom, Inc.*, 2025 U.S. Dist. LEXIS 118739, at \*21-23 (W.D. Wash. June 23, 2025)), and *Clinton* where no GIC repeated for every year.

14

(N.D. Ga. Sept. 20, 2019) ("*Pizarro I*"); *see also Davis v. Stadion Money Mgmt., LLC*, No. 19-CV-556, 2020 WL 1248580, at *8 (D. Neb. Mar. 16, 2020). The summary judgment decision in *Pizarro II* does not help Defendants at the pleadings stage because, as opposed to mutual funds, GICs, including the LNG can be set and reset, s*ee Miller*, 2020 WL 6479564, at *6, and Plaintiffs allege that failing to replace the LNG after years of persistent underperformance has already "frustrate[d] the long-term growth of a retirement plan," unlike the discovery occurring in *Pizarro II* demonstrating that the challenged SVF "consistently outperformed" its benchmark. *Pizarro v. Home Depot, Inc*., 111 F.4th 1165, 1179–80 (11th Cir. 2024) ("*Pizarro II*").

Lastly, Defendants ignore that the method of calculating rates is "clear from the Complaint," MTD at 14 n.5, which explicitly alleges that "the calculated yield is interest credited divided by the end of year balance" in the Form 5500s. AC ¶105 n.15. Defendants raised the same speculative arguments the *Clinton* court rejected, because money entering/exiting the fund during the year is not an "*obvious*" explanation, and, even if possible, "'could skew estimates in either direction'" or "negligibly," meaning that the court had to accept in plaintiffs' favor that there was no "fatal" or "facial" error. *Clinton*, 2025 WL 3470685, at *2,*8; *see also Rodriguez*, 2022 WL 16648825, at *9 ( "the analysis Defendants want the Court to undertake depends on calculations and assumptions that are neither easy to make nor obvious from" the complaint or Form 5500s). The Comparators are meaningful.

D.    **The Extent of Underperformance was Significant**

As a matter of law, it is accepted as true that any underperformance is "significant" (*Johnson*, 122 F.4th at 221–22) and the "rate" was "unreasonabl[e]." *Allen v. GreatBanc Tr. Co*., 835 F.3d 670, 680 (7th Cir. 2016). Creating "a categorical rule" for minimum underperformance would defy the Supreme Court (*Hughes I*, 595 U.S. at 173), especially "because the metrics used

15

to assess underperformance differ across cases." *Fezer v. Lockheed Martin Corp.*, No. 25-CV-0908, 2026 WL 1041276, at *7 (D. Md. Apr. 16, 2026). The underperformance here was significant and persistent when considering the requisite "nature and timing" (*Tibble I*, 575 U.S. at 530) of the LNG's monitoring process, *i.e.*, that its predetermined guaranteed rate is meant to be reviewed quarterly, and can be negotiated. AC ¶¶ 65, 124. Plaintiffs allege substantial underperformance using absolute crediting-rate differentials, the disparities' resulting relative underperformance, and year-by-year comparisons, all measured against the SVIA Index, over five years (inclusive of numerous quarterly reviews). AC ¶¶ 105-29.

It is accepted as true that relative underperformance is the fiduciary standard for reviewing funds, due to "the compounding losses or gains of investments." *Id.* ¶ 24 (applying *Tibble II*, 843 F.3d at 1198). Regardless, lower extents of underperformance have been found sufficient in GIC cases. *See*, *e.g.*, *Somers v. Cape Cod Healthcare, Inc.*, No. 23-cv-12946, 2024 WL 4008527, at *3, 4 (D. Mass. Aug. 30, 2024) (underperformance by 0.07% over a "five year period" was sufficient); *Miller*, 2020 WL 6479564, at *5, 7 (underperformance by 2.20% was sufficient); *Carter I*, 2025 WL 2427614, at *6 ("1.36% is sufficient."); *Payne*, 2024 WL 4228613, at *6-7 (0.71% underperformance sufficient). As the fluctuating rates demonstrate, GICs do not employ a long-term growth strategy. AC ¶ 65. At the pleadings stage in *Davis*, a case from this Circuit, the court rejected arguments that the GIC was a "long-term investment[] 'intended to protect against economic downturns and perform over decades, and therefore their performance cannot be assessed in one-month isolation.'" *Davis*, 2020 WL 1248580, at *8; *see also Pizarro I*, 2019 WL 11288656, at *2-4 (similar); *Payne*, 2024 WL 4228613, at *6, 7.[13]

---

[13] Again, the post-discovery summary judgment decision in *Pizarro II* does not help Defendants, and since the Parties agree that the LNG's rates are "periodically reset" (MTD at 4) and Plaintiffs allege that the long term growth of the Plan was in fact hindered. AC, ¶ 103.

Defendants do not cite to any germane cases. Defendants cite the mutual fund case of *Jones I*, but in a subsequent decision, the court held that "1% to 3.5%, measured at a single point in time," was sufficient because, like here, the IPS said that "one[-], three[-], and five-year periods" was the relevant review period. *Jones v. DISH Network Corp.*, No. 22-CV-00167-CMA-STV, 2023 WL 7458377, at *7 (D. Colo. Nov. 6, 2023); *see also* n.2, *supra*; Dkt. 19-4 at 5, 8-9; *Doll v. Evergy, Inc.*, No. 25-CV-00043, 2025 WL 4042583, at *2 (W.D. Mo. Sept. 10, 2025) (imprudence was inferred because the defendants "waited almost two years to replace the TDFs" after they were put on the watchlist following at least four consecutive quarters of underperformance).

In *Payne*, from this Circuit, the court refused to adopt the holdings of Defendants' out-of-Circuit cases of *Lalonde* and *England v. DENSO Int'l Am., Inc.*, No. 22-11129, 2023 WL 4851878 (E.D. Mich. July 28, 2023), noting that other courts have "reached the opposite conclusion." *Payne*, 2024 WL 4228613, at *7. Plus, *England* only involved two years of underperformance and is no longer good law in light of the Sixth Circuit's later rejected minimum underperformance requirements, even for long-term hold funds. *See Johnson*, 122 F.4th at 210, 219. Defendants misrepresent *Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018) entirely. Unlike the uncompensated risk and other allegations here, in *Barchock,* the complaint challenged that "fund's [particularized] stated investment objective […], *solely*" for being "'too much' like a money market fund" with a particularized, "disclosed choice of benchmark" that was "'too conservative.'" *Id.* at 49 (emphasis added). The First Circuit has not held that "a cautious investment strategy" is *per se* prudent. MTD at 15. Quite the opposite. After *Barchock,* the First Circuit held that there is still "a measurable loss of opportunity" in making too cautious investment decisions. *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 31 (1st Cir. 2018). Plaintiffs have stated a claim for the LNG.

**E.      The Prohibited Transaction Claim is Sufficient**

In addition to alleging preexisting and multiple relationships between the Plan and Fidelity, AC ¶¶ 20, 132-34, 148, binding precedent has upheld the same prohibited transactions alleged here, after rejecting Defendants' arguments. Exactly like here, the *Cunningham* plaintiffs sufficiently alleged that "[t]hese transactions occurred each time the Plans paid fees to TIAA-CREF" in relation to a recordkeeping and investment management contract. *Cunningham v. Cornell University*, 16-cv-06525 (S.D.N.Y Feb. 24, 2017) (Dkt. 81) ¶ 217; *see also* AC ¶¶ 20, 132, 134, 148, 179. In *Braden*, the plaintiff alleged that "mutual fund companies […] shared with Merrill Lynch portions of the fees they collected" (*i.e.*, the Sub-transfer agency fees here), and "[a]s trustee and as an entity 'providing services to' the Plan, Merrill Lynch was a 'party in interest.'" *Braden*, 588 F.3d at 590, 600-01; *see also Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 902–03 (9th Cir. 2023).

Relevant is that "Plaintiffs are not required to plead and prove […] § 1108 exemptions," *Cunningham*, 604 U.S. at 706, 709, including the exemption for "[c]ontracting or making reasonable arrangements with a party in interest for […] services necessary for the establishment or operation of the plan." *Id*. at 695 (quoting § 1108(b)(2)(A)). These exemptions "turn on facts one would expect to be in the fiduciary's possession," *id.* at 705, such as the any recordkeeping contracts, amendments, renewals, and other arrangements with Fidelity here. *See* AC ¶¶ 83-84. Establishing a plan will require contracting with entities that do not have "any preexisting relationship," MTD at 2, to the nonexistent plan, and thus initial contracts are not excluded from the statutes "categorica[l]" bar. *Cunningham*, 604 U.S. at 705. To be sure, when "outside firms" are engaged, "these outside firms become "'part[ies] in interest.'" *Id.*. at 710 (Alito, J. Concurring; citing § 1002(14)(B)). The Supreme Court considered and rejected the *Ramos* approach "that 'some prior relationship'" must exist, which is opposed to the "Eighth Circuit" approach. *Petition*

18

*for a Writ of Certiorari in Cunningham v. Cornell Univ.*, 2024 WL 1116522, at \*15 (quoting

*Ramos*, 1 F.4th at 787).[14] *Braden* also did not hold that there must be a preexisting relationship.

The Supreme Court sided with *Braden* and rejected the Tenth Circuit's reasoning based on "'hiring

an outside company'" for RKA services and "Congress' intent." MTD at 17 (quoting the post-trial

decision in *Ramos v. Banner Health*, 1 F.4th 769, 786–87 (10th Cir. 2021)); *see, e.g.*, *Cunningham*,

604 U.S. at 700, 708, 710; *Braden*, 588 F.3d at 601; *Allen*, 835 F.3d at 676; *Fezer*, 2026 WL

1041276, at \*11.

Importantly, Plaintiffs "need only plausibly *allege* facts supporting" Fidelity's party-in-

interest status during the Class Period "and need not *establish* anything." *Johnson*, 122 F.4th at

222 (emphasis in original). Defendants' prior Form 5500 concession is damaging to their

argument, because Defendants "assume that a transaction in the prohibited group occurred." *Allen*,

835 F.3d at 676; *Fezer*, 2026 WL 1041276, at \*5 (the plan document supports allegations of party-

in-interest status).[15] Plus, Fidelity had other relationships with the Plan. AC ¶¶ 20, 132-34, 148.[16]

Finally, Plaintiffs allege that Defendants, including the RPIC, "is/was a fiduciary" with

"control over Plan management" and Defendants "entered" into contracts and "engage[d]" in the

---

[14] Like *Ramos* and *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25 (D.D.C. 2018), the Fifth Circuit erroneously came to its conclusion by "[r]eading § 1108[(b)(2)(A)] in conjunction with § 1106(a)" exemptions. *D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 612 (5th Cir. 2023); *but see Cunningham*, 604 U.S. at 702 (rebuking this approach). That case involved a one-time "surrender charge," but held that a "service provider" is a party-in-interest at the "point" it "provide[s] services to the plan at the time [its administrative] fees [a]re paid." *Id.*, at 607-08, 613; *see also Sweeney*, 2026 WL 352845, at \*17. the "plain text" of § 1106 (*Cunningham*, 604 U.S. at 708), concerns any "transaction" or "transfer" and does not, even implicitly, to payments made when "the arrangement commenced." MTD at n.10; *see also* n.6, *supra* (defining "transaction" in the legal sense).

[15] Defendants continued to list Fidelity as a Party-in-interest in 2024 (¶ 20 n.5), after their now overturned "authorities" were issued, undermining their alternative explanation for the Form 5500 admission. MTD at 19 n.9.

[16] For this reason, even if Defendants' case of *Eibensteiner* was legally correct (it is not), it is factually distinguishable.

"prohibited transactions with Fidelity." AC ¶¶ 42, 132, 167-68, 175. It is unclear why Defendants believe these allegations are lacking. *See* MTD at 20.

### F.      Defendants Breached Their Duty to Monitor

Although Defendants misrepresent *Krueger*, that case actually upheld similar duty to monitor allegations from here because "ERISA opinions and the position of the Department of Labor make clear that the power to appoint and remove plan fiduciaries implies the duty to monitor appointees." *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781, 2012 WL 5873825, at *17 (D. Minn. Nov. 20, 2012) (listing cases). The plaintiffs sufficiently alleged that the "'Monitoring Defendants[]'[] had the authority to appoint and remove trustees" "the Monitoring Defendants knew (or should have known) of the failures" of their delegees. *Id.* at *18; *see also* AC ¶¶ 158-64. Also, "as several courts have held," the precise delegation of duties "is the type of fact that tends to be in the sole possession of a defendant." *Payne*, 2024 WL 4228613, at *10.

## IV.      CONCLUSION

Defendants have not provided any legal or factual reason why this case should differ from the numerous upheld complaints with similar theories and allegations. For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss, or in the alternative, grant Plaintiffs leave to amend. *See Midwest Med. Sols., LLC v. Exactech U.S., Inc.*, 95 F.4th 604, 607 (8th Cir. 2024) ("[l]eave to amend [the pleadings] should be freely given.").

Dated:  June 30, 2026                          Respectfully submitted,

                                               */s/ Mark K. Gyandoh*
                                               **CAPOZZI ADLER, P.C.**
                                               Mark K. Gyandoh, Esquire
                                               PA Attorney ID #88587
                                               James A. Maro, Esquire
                                               PA Attorney ID #86420
                                               (Admitted *Pro Hac Vice)*
                                               312 Old Lancaster Road

Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200

Stephanie Hinz, Esquire
**PICKENS, BARNES & ABERNATHY**
1800 First Avenue, NE
Suite 200
Cedar Rapids, IA  52407
Email:  Shinz@pbalawfirm.com
Tel.: (319) 366-7621

*Counsel for Plaintiffs and the Putative Class*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2026, a true and correct copy of the above and foregoing document was filed with the Court using its CM/ECF system which will send notice of such filing to all counsel of record.

/s/ Mark K. Gyandoh
Mark K. Gyandoh

22